Charles E. Rank v. Commissioner.
Rank v. Commissioner
Docket Nos. 11902, 28417.
United States Tax Court
1953 Tax Ct. Memo LEXIS 91; 12 T.C.M. (CCH) 1161; T.C.M. (RIA) 53331; October 13, 1953
Getto McDonald, Esq., 505 4th National Bank Building, Wichita, Kan., and Hugh P. Quinn, Esq., for the petitioner. Marvin E. Hagen, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: These proceedings involve deficiencies in income tax and fraud penalties as follows: Docket
No.
Year
Deficiency
Penalty
11902
1940
$ 266.27
1941
2,105.26
1942
29,716.12
$14,858.06
1943
13,746.37
6,873.19
1944
51,542.50
25,771.25
28417
1945
15,493.10
7,746.55
Concessions made by the parties in an agreement filed at the hearing with respect to certain issues will be reflected in the recomputation under Rule 50. The remaining issues are whether the respondent erred in disallowing in 1942, 1943, 1944 and 1945 certain amounts claimed as deductions for *92 commissions, and whether fraud penalties were properly imposed for those years. Findings of Fact Petitioner, an individual residing in Wichita, Sedgwick County, Kansas, filed his returns for the taxable years with the collector of internal revenue for the district of Kansas. During the taxable years petitioner was the sole owner and proprietor of the Kala Club, located in Sedgwick County outside of the city limits of Wichita, where intoxicating liquor was illegally sold by petitioner, and in 1942 slot machines were operated. Petitioner was aware that he was operating the Kala Club in violation of the laws of Kansas. Except when closed temporarily on account of raids or threats of raids, the Kala Club was operated twenty-four hours a day, seven days a week. Sales were made by the drink over a bar until about the close of 1942, after which sales were made only by the bottle. In 1944 and the early part of 1945 the Kala Club could be patronized by the public. At that time whiskey was displayed on shelves in the club. There were about 50 illegal liquor and gambling establishments in operation during the taxable years on the outskirts of Wichita in Sedgwick County, including from seven *93 to twelve within a radius of ten blocks of the Kala Club. During the latter part of 1940 or the early part of 1941 Silas S. Freeman and Robert L. Carnahan, the petitioner in Robert L. Carnahan, 9 T.C. 1206, and Max Cohen, the petitioner in Max Cohen, 9 T.C. 1156, merged their activities and thereafter represented to various operators of illegal liquor and gambling establishments in Sedgwick County that they could protect them from raids and arrests by county and state law enforcement officers. Based upon such assurances some of the owners of such enterprises, including petitioner, agreed to make payments to one or more of them. In some instances, Freeman and Carnahan furnished the bankroll for the gambling establishments, and the illegal enterprise was not opened until the matter was also discussed with Al Bertrand, the county sheriff. Cohen and Carnahan had determined that no liquor business would operate in Sedgwick County without "kicking in" to them. Carnahan has always been a gambler and has never had a legitimate gainful occupation. He was frequently arrested during the nineteen twenties in raids conducted against gambling houses. In the nineteen *94 thirties he served a sentence of a year and a day in a Federal penitentiary for violating a Federal liquor law. Sometime between 1940 and 1946 he was arrested in Sedgwick County for gambling. In 1944 or 1945 Carnahan was indicted for evasion of income taxes and on a plea of nolo contendere received a fine of $15,000 and a sentence of two years. The sentence was suspended and he was placed on probation for four years. The slot machines in the Kala Club were serviced by an employee of Cohen and Carnahan. The employee and Russell Knutson made collections from machines in 35 or 40 establishments, including the Kala Club, amounting to from $4,000 to $6,000 a week, of which 60 per cent was delivered to Cohen and the remainder, less sales tax of two per cent, was paid to the operators. Cohen shared the collections equally with Carnahan after paying undisclosed proportions to Knutson and Joe La Salle. In 1942 Reverend N. W. Nice, an ordained minister in Wichita, was asked by the ministerial association of that city to obtain a warrant to raid the Canyons Supper Club, one of the establishments engaged in the illegal sale of liquor in Sedgwick County. The sheriff laughed at him when he requested *95 a warrant and remarked that he was a fool for making the request because 45 warrants had been isued, of which five were served without finding anything. A warrant was issued but Bertrand refused to participate in the raid, delegating instead three of his deputies. Whiskey and slot machines obtained in the raid were placed in possession of the sheriff's office. The club was in operation the next day and three days later the slot machines were removed from the sheriff's office and delivered to the club employees of Cohen and Carnahan. Petitioner hired his employees and supervised their work, kept the books for the Kala Club, purchased the liquor and managed the business. He leased the building in which the business was operated and owned the bar fixtures. The liquor purchased for sale was stored in "plants" on some farm located five or six miles across the county line in Butler County, Kansas. Freeman, Carnahan and Lee Deer, who was a business associate of Carnahan, never rendered any service in the actual operation of the Kala Club and did not know the location of petitioner's plants. The Kala Club was closed for about eight months in 1943, during which time petitioner sold liquor *96 out of a plant he had on a farm situated in Kingman County, Kansas, the profits of which he did not share with anyone. Petitioner was arrested in 1935 and on conviction was fined $6.90. In February 1936 he was convicted on a charge of possession of liquor and liquor nuisance and served about 20 days of a sentence. The Kala Club was raided November 8, 1945, and about 60 cases of whiskey, of a cost of from $3,500 to $3,800 was confiscated. It was not in operation for the remainder of the year. Petitioner was not arrested at any time during the taxable years except in December 1945, when he was arrested on a charge of possession of liquor and maintaining a nuisance at the Kala Club, and on conviction was fined $200 and sentenced and placed on parole. During the taxable years Freeman, Carnahan, Cohen and Deer had an understanding with petitioner for protection of his operations at the Kala Club against raids and arrests for 50 per cent of the profits of the business. In his returns for 1942, 1943, 1944 and 1945 the petitioner reported the following amounts of net income from the of net income from the operation of the Kala Club, after deducting as business expenses for commissions *97 paid, the amounts shown: Net
Commissions
Year
Income
paid
1942
$20,962.52
$24,015.92
1943
39,382.25
13,446.00
1944
49,589.56
44,075.00
1945
28,924.52
24,922.00
Of the amount deducted as commissions paid in 1942, $10,382.62 was paid to Freeman, who retained one-third and delivered the remainder, in accordance with a "side" arrangement, in equal amounts to Carnahan and Cohen, and $12,658.30 was paid to Carnahan after June 15, who paid one-half of it to Cohen. The record does not disclose to whom the remainder of $975 was paid. The payments in 1943 and 1944 were made to Carnahan and those in 1945 to Deer. The payments were made each year for protection of the Kala Club against raids and arrest. The respondent disallowed the deductions claimed in the returns for 1942, 1943 and 1944 upon the ground that they represented payments made for the protection of petitioner's operations. The deduction taken for 1945 was disallowed upon the ground that it did not represent an expenditure deductible under the provisions of section 23, I.R.C.
Except for 1944, and one entry on January 6, 1942, for $975, the books kept by petitioner contain *98 no entries for payment of commissions. The books for 1944 contain eight unexplained notations, one for each month except April, June, October and November, of commissions paid totaling $44,075. The notation made each month is a figure representing one-half of the difference between expenses, including cost of liquor purchased, and receipts from sales. For the years 1942 and 1943 petitioner advised the accountant who prepared his returns of the amounts to deduct as commissions paid. Petitioner informed the accountant that the amounts were paid for supplying capital for the operation of the business. The accountant concluded that the arrangement described by petitioner did not create a partnership and no partnership returns were filed. The term "commissions paid" was used by the accountant in preparing deductions for taxpayers having similar deductions. The accountant also prepared returns for Freeman, Carnahan and Cohen. The books maintained by petitioner do not reflect the total profit realized by him from the Kala Club, or inventories, or any loans from Freeman, Carnahan, Cohen or Deer, or any investment by them in the Kala Club, or contain any entries for loss sustained from raids *99 or confiscations of liquor. The petitioner filed false and fraudulent income tax returns for the years 1942, 1943, 1944 and 1945 with intent to evade tax. Opinion There is agreement on the amount paid to Freeman, Carnahan and Deer and deducted as commissions. The controversial question is the purpose for which the payments were made. Petitioner's contention is that the payments were made pursuant to oral agreements under the terms of which the recipients were to supply capital for his illegal business and assume any losses sustained in confiscations of liquor, for one-half of the profits of the club. Respondent's position is that the amounts were paid for promises of protection against raids and arrest by law enforcement officers. Petitioner concedes that the amounts are not deductible if they were paid for protection, as determined by the respondent. The question is factual and requires the weighing of sharp conflicts in the testimony. In support of his position petitioner relies upon his testimony and that of his co-conspirators, Freeman and Carnahan, corroborated, he alleges, by testimony of the accountant who prepared his returns, and by his books and records. More reasonable *100 evidence, and inferences properly to be drawn therefrom, under all of the facts and circumstances, are opposed to such a conclusion. We have considered all of the evidence and the record as a whole in determining our findings of fact. Although petitioner kept records of expenses, purchases of mercandise, and receipts from sales, the books contain no entries for loans or advances by Freeman, Carnahan or Deer. Except for one unexplained entry in 1942 and notations made in the books in 1944, no entries were made for the payments. In view of the accounting practice followed by petitioner for recording other transactions, it seems to us that a like method would have been employed to record the payments to Freeman, Carnahan and Deer if they had been made for the purpose alleged by petitioner. Although under the alleged agreements they were to receive one-half of the profits of the business, the amounts do not include such share of the profits from slot machines and they were not computed on the basis of actual profits of the enterprise. There is testimony that the alleged plan was entered into in 1941 because of a need for working capital. If so, in view of the large profits made by *101 the petitioner, it is unreasonable to conclude that financial help was required throughout the taxable years or that he would continue to pay such excessive charges for temporary use of money. The split of the payment made to Freeman during the first half of 1942, among him, Cohen and Carnahan, discloses a deal other than one for advances by Freeman for working capital. The same theory applies to the payments made to Carnahan for the remainder of 1942, which were divided equally between him and Cohen. Deer's place in the general plan is conclusively shown by testimony that he assumed the promises made by Carnahan. Among the reasons assigned for the alleged withdrawal of Freeman and Carnahan from the deal was fear of loss of their advances through confiscation of petitioner's liquor. The falsity of their testimony on the point is illustrated by the fact that although they testified to advice given petitioner on methods to employ in the conduct of his operations at the Kala Club to minimize cause for raids, they and Deer did not know the location of petitioner's plants. The lack of probative value of Freeman's testimony as to actualities is otherwise shown by his testimony, contrary *102 to documentary and other reliable evidence, that the books of petitioner, which he testified were examined by him, showed his advances and an inventory of liquor. Other testimony of Freeman and Carnahan is that when each ceased his relations with petitioner the succeeding participant paid him for petitioner's inventory of liquor at the time of his withdrawal. The total lack of reliability of the testimony on the point is shown by the fact that no inventories were maintained in any form and their alleged interest in the venture was for advances to buy liquor and not ownership of liquor, hence any liability of petitioner to the recipients of the payments would be for loans, and the books disclose no entries for loans made or payment thereof. Further discussion of the testimony relied upon would serve no useful purpose. It is sufficient to say that a detailed examination of all of it in the light of other evidence fails to convince us that it sustains petitioner's position. The finding of respondent that the amounts were paid for protection is presumptively correct. Evidence before us, instead of overcoming the presumption supports it. The testimony offered by respondent establishes *103 that the individuals who received the payments represented to petitioner that they were in a position to protect his illegal business and undertook to do so in consideration of payments by petitioner. There is some direct testimony on the point and it is corroborated by circumstances and reasonable inferences from other evidence. So concluding, no error was committed by the respondent in denying the deductions. The basis for respondent's claim of fraud is confined to the deductions taken for payments for protection. He asserts that the deductions taken were calculated to deceive and mislead him. In G. A. Comeaux, 10 T.C. 201; affd., 176 Fed. (2d) 394, we held that deductions taken for protection payments made to Cohen and Carnahan by the operator of an illegal horsebook business in Sedgwick County may be the basis for a fraud penalty. In The Lorraine Corporation, 33 B.T.A. 1158, we held that deductions taken as commissions and traveling and entertainment expenses for expenditures made for illegal acquisition of alcoholic liquor constituted fraud with intent to evade tax. Petitioner's returns did not reveal the true character of the deductions *104 and to say that he was unaware of the erroneous designation would be contrary to the clear proof in the record. He can not avoid the consequences of the acts by relying upon the preparation of his returns by an accountant. Instead of exercising the care required of him, as in Davis v. Commissioner, 184 Fed. (2d) 86, petitioner actually misrepresented the facts to his accountant. Continuation of the improper deductions with knowledge of their misleading and deceptive character is corroborative of intent to evade taxes. M. Rea Gano, 19 B.T.A. 518. The result of the false deductions was an understatement of taxable net income. The proof of respondent supports his imposition of the fraud penalties for the years 1942 to 1945, inclusive. Petitioner concedes that if any part of the deficiency is due to fraud with intent to evade tax, there is no forgiveness under section 6(a) of the Current Tax Payment Act of 1943. Decisions will be entered under Rule 50.